of Health and Human Services and others. Ms. Carroll is here for the appellates and I note that for the appellees, Mr. Totaro, Ms. Coberly, and Mr. Shulman are here. You may proceed, Ms. Carroll. Courtney, Your Honors, may it please the Court. Courtney Carroll on behalf of the Appellant Transplant Center Hospitals and Patients. In the proceedings below, the District Court felt compelled to defer to the agency under a reflexive framework that the Supreme Court has since rejected. And the District Court has now determined that Kaiser raises a substantial issue that warrants the Court revisiting the deference analysis in the appealed order. Under the agency deference framework that now governs post-Kaiser, it would be inappropriate for the Court to defer to the agency's reading of the disputed regulation. Without deference, the agency's reading is unpersuasive and plaintiff's construction should prevail. I'd like to The tools of regulatory interpretation are exhausted, as Kaiser requires. The regulation is not genuinely ambiguous, but instead is unambiguous in plaintiff's favor. Let's just maybe put a pin in it there. We'll let you get back to two and three, but explain that to me because I read the regulation and I sort of think the better reading is the other reading. So explain to me why your reading is unambiguously correct. Yes, Your Honor. I'd like to start with, to help answer that question with framing up the two different defendants' interpretations that are present before this Court now. So it's important to note that in the District Court, HHS offered an interpretation that differs from what it's now urging. In the District Court, they said the regulation unambiguously provided only one way for the Advisory Committee and Federal Register procedures to apply, and that was if the policy was designated by the contractor to be quote-unquote enforceable. Well, but they don't need unambiguous. You need unambiguous, right? No, I would not submit to that, but to the extent that there is a question about ambiguity, the only interpretation that there is evidence of on the record is a Bureau Associate Administrator Declaration post hoc that says, and this is Doc 34-15, that the procedures in dispute here are quote only required for policies that the OPTN proposes to be enforceable. So now on appeal, HHS has changed its interpretation. UNO still maintains that the only way in which the procedures apply is if it's enforceable, but HHS now says there are two pathways through which these procedures might be required. Second being directed by the Secretary? Correct, yes. I mean, that's just clear on the face of the regulation, right? I mean, as I read sub 2, there are two ways by which the 60-day advance notice to the Secretary criterion begins this whole process. One is that they're designated to be enforceable. The other is that the Secretary directs. And then in the flow chart, next sentences, the Secretary will refer, and this is where the rubber really meets the road for you, significant proposed policies on to ACOT and into the Federal Register. So the reason I say that it seems to me the better reading is that only the significant policies are some subset of the enforceables or the directed policies is that that sort of makes the flow chart work to me, right? I see it coming into the Secretary 60 days in advance if it's enforceable or directed, and then after that, the Secretary is sort of a hinge point, and then he or she sends it out if it's a significant proposed policy. So there's nothing in the fourth sentence that the Secretary will refer significant proposed policies to the Advisory Committee. There's nothing there that's limiting it in this kind of flow chart structure that you're thinking of. But doesn't that make sense? I mean, like with the Secretary as the fulcrum, that's the piece of it that sort of I find compelling is that before you get to the Secretary, if it's designated to be enforceable or directed, then he or she gets 60-day advance notice, and then it's sort of like in-house, and then the fourth sentence says insignificant proposed policies get sent out. It just seems like the stuff that's coming into the House is the stuff that's going out of the House. So I think it's important to note for context that the way in which the Secretary receives policies proposed by the OPTN is not exclusively through this 60-day measure. And in fact, there's a declaration on the record that explicitly states  were present at all of the meetings where this particular policy was discussed. So the Secretary, I think it's reasonable to assume that the Secretary would have an awareness of quote-unquote significant policies. So perhaps for non-significant policies, the structure that you're envisioning is required because you need some way in which for the non-significant policy to be called to the Secretary's attention. But in this case, the Secretary was present at all the meetings, was fully aware this a significant policy. Secretary Azar himself, this is on the record in Congress, acknowledged this very policy is significant. And so he was completely aware that this policy was being developed. And that's reasonable to understand that there might be a different process. You don't need this 60-day notice, those two sentences that you're referring to, to then trigger what might the Secretary do with a quote-unquote significant policy. And again, there's nothing in the text itself that is so limiting. And to the extent that there are any questions that this court might have about the plain text and whether it is ambiguous or otherwise, we would submit that Kaiser now requires that you look to the other, you must exhaust, as Kaiser says, the other tools of statutory construction. And in this case, the defendant's reading of the regulation conflicts with federal law and is also unreasonable. And as we've... So what are the other tools of regulatory construction, if not the plain text, that you think compel a Kaiser conclusion for you? Yes, Your Honor. So we believe there's two bases. One is that it conflicts with federal law and the federal contracting law that we discuss in our briefing. And two is that their interpretation is unreasonable. So that's genuinely ambiguous such that an interpretation of the agency should be deferred to, that interpretation must be reasonable. And in this instance... So what happens at step two, if I'm misunderstanding something? If at step one, I tend to think of this in Chevron terms, and I know that's not precisely correct. But if at step one, there is an unreasonableness criterion before you even get to step two, then what happens at step two? So the step two that I'm thinking of, and again, these terms are all, as you said, newly being developed. But the step two that I'm thinking of is whether the context and the character of the interpretation entitles it to deference, whether it was one actually made by the agency, whether it's authoritative and official, whether it's fair and considered. So those are the elements that I would put into step two. Step one, I believe, is the exhausting the tools of the canons of construction. And then in the middle is this, it must be reasonable requirement. So perhaps the reasonableness is a 1B. Yeah, gotcha. Can you turn to whether or not we have subject matter jurisdiction to determine whether the agency's interpretation is reasonable or not? If this policy, this liberal allocation policy is not a final agency action, then we don't have subject matter jurisdiction, do we? It's got to be a final agency action. So with respect to the count that I'm primarily discussing right now, which is count one of our complaint, that is a failure to act claim under the Administrative Procedure Act. And the failure to act in this case is clearly an obligation of the Secretary. It was the Secretary's failure to submit the policy to the Advisory Committee and to publish in the Federal Register. And so that is the agency's action that this court has clear jurisdiction to review under 706 subpart one. So with respect to counts two and three, whether or not there is subject matter jurisdiction there, we would submit that the final agency action is the agency's ratification of the policy that is in dispute, number one. Number two, we also argue that there are reasons why UNOS should be considered as an agency and a government actor for purposes of the Administrative Procedure Act and the Due Process Clause. Sorry, Chuck. Bennett versus Spears tell us that in order for there to be final agency action, there are two requirements. The first is that the action must mark the consummation of an agency's decision making process. But more importantly, number two, it has to be one by which rights or obligations have been determined from which legal consequences will follow. My concern is with regard to that second requirement. There can't be any legal consequences that will follow from the new policy if the network members voluntarily, they're just required to voluntarily comply with the new policy, right? No, Your Honor. So the network members, this goes far beyond just the members of a voluntary organization. So for example, four of our plaintiffs are patients. They have no ability to voluntarily comply or not comply with this policy. It clearly affects their rights because it dramatically affects the way in which they have an opportunity to receive an organ. So the Secretary's failure to follow the process required under the regulation means that their rights were affected. And I'll note that the... Can the Secretary bring enforcement proceedings for non-compliance with the policy? So in the, in the governance declaration, Your Honor, this is from the, I believe it's the 2011 declaration. They do say that they may bring enforcement actions even for non-enforceable policies within the OPTN. The distinction is that the enforceableness does not affect your Medicare billing. So the only thing is that you can't be kicked out of Medicare if you're not complying with an enforceable policy. As a practical matter, I'll also note that our transplant center hospitals, if they were to not comply with this policy, they would not be able to get organs to transplant. So there is a system that is a federal system. Defendants have labeled the donated organs as a public trust in this has a responsibility to administer that public trust. So tell me again, if there's a failure to comply with the policy, what are the legal consequences that will follow? If a transplant center fails to comply with the policy, there, in the declaration submitted by HHS, there are sanctions that both the OPTN as well as the Secretary may impose. Those sanctions do not for the liver transplant patients who are on the wait list. There is also the fact that they will not receive an organ offer if they have been adjusted in their position. Can I ask you a question, another question about the significant proposed policies? So your point, I take it, is that these organ allocation policies like this one are significant as a matter of law. And you said has acknowledged that it's significant. How then do we explain, if you take the factual premise, and you may dispute it, but how then do we explain the fact that these have never been sent through the Federal Register notice and comment process? Just like oversight from time immemorial or something different? So I think there's two things happening. So first, I can't speak to what did or did not decide to enforce these rules 20 years ago. And there's nothing in the record that informs us as to the historical motives of the parties. However, any decision of the plaintiffs to previously not enforce those procedures does not affect the ability of them now to enforce procedures. And just because the government has been violating the law for 20 years doesn't give it permission to continue to violate the law. And in this case, I'd note that the past practice of the agency is just that of practice. There was never a written interpretation of what a significant policy means until this litigation. And now the agency has, in fact, proffered two different interpretations. So this is not a case where you have a long-standing, consistent agency interpretation that would warrant deference. And in fact, it's more akin to what the Supreme Court reviewed in Christopher v. SmithKline-Beacham, where the Department of Labor had changed its case even under our, the Supreme Court said, we do not defer to the agency's shifting post hoc interpretation. I see I'm over my time. If there are no further questions, I'll save my time for rebuttal. Thank you. Thank you, Ms. Carroll. We'll hear from Mr. Totaro. May it please the Court. Martin Totaro for the United States Department of Health and Human Services. Plaintiffs argued that the Acuity Circles policy must be struck down because it did not go through the enhanced procedural requirements of 121.4.B.2. That argument is incorrect. The new policy, which went through the same notice and comment procedures as every other organ allocation policy for the past 20 years. Was it published in the Federal Register? It was not published in the Federal Register. It followed the procedures of 121.4.B.1 as every other organ allocation policy was. And after following those procedures, it resulted in a the sickest patients, regardless of whether, where they live geographically, entirely consistent with the regulations. The procedures in B.2 apply in two scenarios. I was thinking in terms of a funnel, but Judge Newsom is correct in his interpretation too. I think it comes through, the significant arises in one of two scenarios. Either a policy is enforceable or the Secretary reaches out and scenario is present here and plaintiffs do not contend otherwise. And now what about her point though, that there are other ways that significant policies can come before the Secretary. So it's not always the 60-day advance notice kind of funnel that I was thinking about, but they might come to him in other ways. So two textual points, Your Honor. First, if you look at 121.4.B. where the significant requirement arises, it first starts out with the Board of Directors shall. So we're really talking about here about the Board of Directors taking action and then the Secretary, in his discretion, deciding to, quote, refer significant proposed policies to the Advisory Committee. And I think both the combination of Board of Directors there and the word refer suggest that a policy is before the Secretary in one of the two ways in the sentence that immediately precede the requirement. So in effect, the funnel, there may be other ways that significant proposed policies find their way onto the Secretary's desk, but this regulation is talking about the funnel. So the critical point here is that significant is a term of art in 121.4.B.2. And so we're not saying that how a liver gets allocated to an individual person is insignificant. We're saying significant in this limited context under 121.4.B.2 is referring to one of the two ways the policy gets into the funnel in the first place. Got it. I'm happy to answer any other questions about the process. If not, I would go to Judge Wilson's question about subject matter jurisdiction. Your Honor is correct about Bennett v. Speer. We think of jurisdiction probably, the best way to fit this case into subject matter jurisdiction probably isn't failure to act, but that the agency's final action is our response to the critical comment that was submitted. And that could be viewed as affecting the individual's rights because it would say that the Secretary has decided, again, consistent with organ allocation policies for the past 20 years, that this has to go through the B-1 bucket only and doesn't, the B-1 process only and doesn't need to go through the enhanced procedures of B-2. Turning to the substance, I readily acknowledge that in the ordinary case, it would be, it would take a lot to stand here and ask you to address the substance when the district court didn't do so in the first instance. I submit that this is an extraordinary case. What is on appeal is the denial of the preliminary injunction. Plaintiffs raised three separate arguments. The district court only ruled on the first process-based point, but then on appeal, the plaintiffs offered their full panoply of arguments for why the decision is arbitrary and capricious, and we, you know, in response demonstrated why it wasn't. Did anybody at any point, this just seemed odd to me, did anybody at any point say, and I realize things were moving quickly, but say to the district court, like, wait, wait, wait, we had three claims, you only adjudicated one of them and then denied the preliminary injunction? I think, Your Honor, it was pointed out in the briefing before, when they were deciding the injunction pending appeal, and so I confess I'm not sure why the district court did not address the other sets of claims, but the critical point is all of the material is before the court right now, and plaintiffs offer a list of reasons why the policy is arbitrary and capricious. I'd like to tweak that with one respect. I think what is here for this court to review is not whether, you know, full stop, the policy itself is arbitrary and capricious, but according to the regulation, what did the secretary have to do? The secretary had to consider the policy in light of the Organ Transplant Act and the regulations, and so this court must ask whether what the secretary did there was arbitrary and capricious, and, Your Honor, that's in 121-4-D, where it's laying out what the secretary has to do. I think the most serious challenge to the policy for this court to confront is the point that this policy might lead to 57 fewer livers. That wasn't a point that was overlooked by the OPTN or the scientific registry. Instead, it was addressed, and they said the model likely underestimated the number of organ transplants, and the reason for that is because the model doesn't depend on, doesn't factor in changed behavior in response to this new policy that will allow livers to go further distances to individuals who are the sickest, and so they were able to determine that when a prior policy that also was based on a prior model that also did not model for changed behavior, the OPTN said, well, that probably also underestimates the number of liver transplants, and that turned out to be correct, so in the Model 35 policy, which also predicted a fewer number of liver transplants, OPTN said that probably wouldn't happen, and, in fact, that did not happen, and in the first two years of that policy, something like 850 more livers were transplanted with no increase in discharge. Was it possible for this, given the timeline, was it possible for this policy to have been vetted through ACOT and through the Federal Registry? Did you have time to do it, or did you just get yourself kind of behind your own eight ball and said, well, we're not going to have time for that, so we'll proceed under B1? I don't think the eight ball is of the agency's making. I think it's that the policy that gives livers to the sickest patients, you know, the quickest, it needs to get into effect as quickly as possible. I don't know how long it would have taken to refer to the Advisory Committee on Organ Transplant. I would note, however, that almost 10 years ago, in 2010, the Advisory Committee said there is far too much emphasis being put on these donation service areas and regions, and what we have here is a national policy that has to be equitable on a national basis. Can HHS enforce the new policy, and if it can, how? Your Honor, HHS cannot enforce the new policy. This is an OPTN policy. If, for example, hospitals decided, well, it's a policy, but it's non-enforceable, so we're just going to ignore it, then, as we point out on page 9 of our brief, we could direct OPTN to try to make it an enforceable policy, but I want to be crystal clear here. This policy is not enforceable, and no Medicare or Medicaid funding could be terminated for a violation of the policy. So, if it's not binding or enforceable, it's not final agency action within the meaning of Bennett v. Spears, and we lack subject matter jurisdiction to consider it, because we only have subject matter jurisdiction to consider final agency action. Is my understanding wrong about that? I think the right here could be concluded in a final agency action, which is the response to the 121D letter, which is that this policy need to only undertake the procedures of B-1 or B-2, instead of B-2. But I take your Honor's point, and the question for this court would be whether a liver allocation policy is reviewable or not. Going back to Judge Newsom's point, I think the critical point here is that plaintiff's view would severely upset the delicate balance between the OPTN and the Secretary that the National Organ Transplant Act created in 1984, by removing the Secretary's discretion and pushing all these policies to the Advisory Committee, as well as the Federal Register. I see my time is up. If I could just end with one final point. The U.S. Department of Health and Human Services took this very seriously, and pursuant to that role, it directed the OPTN to come up with a policy that complies with the legal requirements. The OPTN did so. The Secretary concluded after considering the policy that no further action was warranted, and so therefore we ask that the injunction, that the denial of preliminary injunction be affirmed. And we also ask, and we know it's an extraordinary request, for the injunction pending appeal to be vacated immediately after argument. All right, thank you. No further questions. Thank you, Your Honor. We'll hear from Ms. Koberly. Good morning, and may it please the Court. I'm Linda Koberly for UNOS, which is the OPTN. I'd like to focus for a second on what's really at issue here, which is that my client is trying to implement a policy that will get livers to the sickest people first, and it will save more than 140 lives in the first year. And that policy is currently on hold because of the injunction pending appeal, which is why my colleague asked that that injunction be lifted. What that means is that suppose a liver becomes available in Charleston, South Carolina. Today, that liver will be offered to a moderately ill person 600 miles away in Memphis before it go to a status one person 266 miles away in Atlanta, and it's going to have to fly directly over Atlanta to get there. So this policy needs to be changed. Now, what UNOS is an organization that reflects the entire transplant community. By regulation, half of its board is made up of doctors. And HHS has, and Congress, have wisely left the details of transplant allocation policy to the medical community in the form of UNOS. No policy has ever gone through the B-2 process. The B-2 process is specifically designed for policies that are going to be enforceable or other policies as the secretary so directs. And in that context, I would like to correct a misstatement made by counsel for the appellant. We agree on what the regulation means. At the which is that the secretary also has discretion to apply the B-2 policy to other process to other policies as the secretary directs. There are simply two different ways that the B-2 process can be triggered. So let me ask you this, because one thing I found a little weird is that, you know, your opponent says, well, so now OPTN, which is effectively a non-governmental entity, can unilaterally sort of short circuit or end run the federal register process by just continuing to designate things unenforceable, unenforceable, unenforceable, unenforceable. So is the response to that, well, the check on that is that the secretary can always direct that things be sent to him or her so that he or she can then send them on through the federal register? That there's this second path? Exactly. And that's why the secretary has said, and this is in the federal register publication associated with the original proposed final rule, the secretary recognizes that compliance with certain policies, such as those related to organ allocation, are crucial to the success of the OPTN and expects the OPTN to monitor compliance with these policies closely, which it does. If violations are widespread or if uniform compliance is essential, the secretary will consider making such policies enforceable. So the secretary does have that power. And just to be clear, no policy, no organ allocation policy has ever gone through the B-2 period because the system works. And it works really well because in general, it has built consensus over all these years. Now, in this instance, these hospitals believe they have an economic interest in maintaining the status quo. So they objected. They are a small subset of the they didn't like it, but they were outvoted. They participated in this process. They put in, many of them put in comments as part of the OPTN's own process. They put in a critical comment after the process. And to be clear, nobody, including these hospitals, took issue with the fact that this policy did not go through B-2 until eight days before the policy was to be implemented when they filed this lawsuit. The critical comment that they filed with HHS does not raise the process issue. That is what got the district court's attention and caused her to take action. Now, we believe because the district court did deny. Well, you're going over your time. I am. And I apologize. Can I just make one more point, Your Honor? I just wanted to say we, as far as the subject matter jurisdiction issue is concerned, and we do brief that in our brief, we obviously think that the policy itself cannot be challenged under the APA because it is not a final agency action. We agree, however, with HHS that HHS's own action on the critical comment is a final agency action, but it could not possibly support a claim for relief because it is a matter that 121-4D entrusts to the Secretary's discretion. Thank you very much, Your Honor. Thank you, Ms. Caldwelly. And Mr. Shulman. Good morning. May it please the Court. My name is Mati Shulman, and I represent the intervener appellees. I'd like to make three points. First, Congress entrusted the medical community to implement a system that allocates organs on a nationwide basis to the sickest first. That is the OPTN. The OPTN, by its very design, has representatives from the transplant community, doctors, medical professionals. It has donors on the Board of Directors. It has to have weightless candidate representatives on the Board of Directors. There's a very broad spectrum of people who are in the best position to evaluate complicated medical issues, oftentimes conflicting data with the real-world practicalities of how organ donation works. That's the design that Congress put in place, and that's the design that the appellants are now asking this Court to second guess. All of the issues raised by the appellants were presented to the OPTN Board of Directors. They know how to understand this stuff. They rejected the arguments. They were then presented again to HHS. They rejected it. It was presented to the District Court. It was rejected a third time. This Court should affirm the District Court and not revisit the medical community's decision on this. Second point, the scales of justice here are not for patients against the government or even against the government contractor. The scales of justice here are for less sick, weightless candidates against hundreds of sicker, weightless candidates around the country who are in hospitals waiting for livers and cannot get them because right now the current policy allocates livers in an unfair, arbitrary manner that favors less sick people. That's the two sides of the scale. That's what this Court ultimately has to weigh. That's what the medical community weighed at the Once again, this Court, as the District Court did not, as the HHS did not, and as the OPTN decided, should let the medical professionals make that decision and balance those scales because they're best suited to do so. Let me just make one final point. The public interest. Everybody agrees it's in the public interest to follow the law. But you have over here a situation where because of the pending appeal, there is in place a policy that has all the same procedural deficiencies as the acuity circle policy that the OPTN wants to implement. It didn't go through the Federal Register. It's just as procedurally possibly deficient depending on how this Court decides. But besides all those other problems, it has a much bigger problem. It is arbitrary because it allocates organs based on arbitrary geographic boundaries. That's the problem that everybody agrees with and they're trying to solve. To the extent any policy should continue in place, it should be the policy that's the lesser of two evils. The new policy, which is now enjoined by the District Court because of the stay pending appeal, may have some problems, but it's certainly not as problematic as the policy that's currently in place. And therefore, we ask the Court to both affirm the District Court and to overturn the stay pending appeal as extraditiously as possible because people's lives really depend on this. All right. Thank you, Mr. Shulman. And Ms. Carroll, you've reserved some time for rebuttal. I'm still hung up on subject matter jurisdiction. Thank you, Your Honor. I would like to clarify with respect to the binding nature of the policy that it's document 68-2 at paragraph 7 where the HHS declaration says that violations of OPTN can still subject OPTN members to sanctions by the OPTN. In addition, the Secretary may take appropriate action based upon determination that a risk to the health of patients or to public safety exists. And that stems from 42 CFR 121.10. So it is inaccurate to say that there can be no governmental ramifications from the enforcement of a so-called non-enforceable policy. I would also like to clarify that with respect to the plain language of the text, as Judge Newsom was asking about, defense counsel says that there is no dispute that we don't agree that either one of those funnel steps took place. And there actually is a dispute on the record as to whether or not this was a policy that was on a subject matter that the Secretary directed. So I believe that defendants interpret that rule to mean that it has to be something that the Secretary directed a policy to be given to him. But this is a matter on which the Secretary directed. The Secretary said to the contractor, you must develop a new policy. And the district court found that at document 72, the transcript at page six, that this was a policy that had been directed by the Secretary. With respect to counts two and three, we would submit that really remand is the most appropriate scenario here because although we have briefed some of that information, the record is very little on what took place. As you note, the district court did not mention this in the order at all. And so at the very least, it's appropriate to remand for that court to consider counts two and three. I would also like to note that with respect to how we determine the appropriateness of the policy and who is the most sick, there is a dispute of that as well. And that we're not suggesting that sick patients don't need organs. We're saying that patients who are sick and are most likely to die need organs. The new policy is going to reduce the number of transplants performed nationally. That is not in dispute. The new policy will not save lives. That is not a term that's in the government contractor's report. It is made up for this litigation. And 57 fewer transplants will be performed under the new policy. That means 57 fewer patients who can be saved, 57 more livers wasted, even with the same number of organs that are donated. And we would also like to note that the current policy has been in effect for 17 years. There is no need to hastily change it within a brief period of time. If there are revisions that could be made that would benefit the national transplant community, we submit that the time that needs to take place to make a thoughtful, careful decision should be used to improve the policy. And with that, we rest on our briefs. I'm not really sure that this matters, but what's your response to the point that the current policy is just as procedurally jacked up as the new policy? So again, the current policy has been essentially in effect since 2002. So I can't, I don't know why in 2002 that process was not implemented. Every argument you have to challenge the new policy likewise undermines the old policy, or would have in 2002, had you brought a challenge. Every challenge with respect to the advisory committee, yes, your honor. Substantively, we would obviously disagree. Gotcha. Okay. Thank you. All right. Thank you, counsel. And the court will be in recess until 9 o'clock tomorrow morning. Thank you.